PEOPLE *v.* BURKHART.

1. HOMICIDE—EVIDENCE— HUSBAND AND WIFE—ADULTERY — MOTIVE.

    It was competent for the prosecution to show that respondent who was charged with murder had illicit relations with the wife of deceased.

2. CRIMINAL LAW—EVIDENCE—WITNESSES.

    The respondent was properly refused permission to show that the prosecution caused several witnesses to attend, but did not place them on the stand.

3. SAME—TRIAL—CONDUCT OF COURT.

    In overruling objections of respondent, urged on the ground of immateriality of the testimony, the court committed no prejudicial error in stating that it was material or in requesting counsel not to be so quick about taking an exception.

4. SAME—CHARGE.

    Nor did the court err in charging the jury that they might believe respondent's testimony that he had not been unlawfully

intimate with the wife of deceased, but that they should take into consideration the fact that respondent was charged with a serious offense, and was under inducement to tell a story that would most redound to his credit.

5. SAME—TRIAL—PRESENCE OF RESPONDENT.
    The court did not commit prejudicial error in calling the jury back, in the absence of the accused, and advising them to come to an agreement.

Error to the recorder's court of the city of Detroit; Phelan, J. Submitted January 20, 1911. (Docket No. 177.) Decided March 31, 1911.

Michael Burkhart was convicted of manslaughter. Affirmed.

*Percy W. Grose*, for appellant.

*Philip T. Van Zile*, Prosecuting Attorney, and *Fred H. Aldrich*, Assistant Prosecuting Attorney, for the people.

MOORE, J. An information was filed against respondent, charging him with the murder of Robert Barrows. He was convicted of manslaughter, duly sentenced, and has brought his case here by writ of error.

The assignments of error are grouped by counsel as follows:

(1) Admission and exclusion of evidence.
(2) Prejudicial remarks of prosecuting attorneys and the court in the presence of the jury.
(3) Argument of prosecutors to jury.
(4) Refusal of court to charge as requested by respondent.
(5) The charge of the court as given.
(6) Action of court in calling jury into court while deliberating, and in the absence of respondent, and the remarks of the court at such time.

Before taking up these assignments in detail, it may be well to get a general view of the case as shown by the testimony of the wife of Mr. Barrows, and the testimony of respondent.

165 MICH.—16.

"I am the wife of Robert Barrows. On May the 4th of this year, at a few minutes past nine in the evening, I was on the corner of the new Y. M. C. A. building. I met Mr. Burkhart, the defendant. Mr. Burkhart called me up by phone about 8 o'clock. After talking with him, I met my husband before I met Burkhart. Burkhart and I went from there back to the place where I worked. We got there about 9:45. I went in the house when we got there. Burkhart did not. There is a front entrance, a side entrance, and a back entrance to this house. I went in at the kitchen entrance. This was a boarding house. I was a dining room girl at this time. I went in the house and took off my hat, and went to the bathroom, and went back into the room where the other girl was. I then went out in the yard. Mr. Burkhart was on the stoop in the corner when I went out. He stood up in the corner. I asked him what he was in the corner for, and he said, 'Just to see where you were; that is all.' He sat down on the stoop with me. We just got seated, when I heard some one coming, and I says, 'Here comes some one,' and I got up off the stoop and I saw my husband come in, and I says, 'Mike!' And my husband rushed past me with his arms outstretched and ran right up the steps. He says to Burkhart as he passed me, 'What are you doing with my wife?' That is all I heard. I heard a shot; I didn't see any one else present. I stood right where I was when he came in. My husband was at the top of the steps and the shot was fired. After the shot was fired, Burkhart ran past me and out. After the shot I walked into the kitchen with him.

"*Q.* You may state if he (your husband) said anything to you while you were going in the kitchen in response to what you said to him?

"*A.* He said, when I saw the gun I started to back off the steps.

" *Mr. Grose:* I ask that that be stricken out.

" *The Court:* I will leave it stand.

"*Mr. Grose:* Exception."

A further examination of Mrs. Barrows developed testimony tending to show that soon after she became acquainted with respondent she assumed illicit relations with him, which were continued until the time of the shooting. Objection was made to this testimony, which objection will be considered later.

The respondent's version of the occurrence was as follows:

"When we arrived at 143 Lafayette, we went to the back part of the house. I left her right there by the porch. When she came out I was standing there by the steps; I think it was by the steps or on the porch; I don't remember. We went to the other porch; we went upon the porch. We were on top of the porch about three minutes; I think I was standing. Well, we heard somebody walking. Mrs. Barrows ran down off the steps, and just as she was about 10 feet from the bottom step Mr. Barrows came rushing around past her. He hollered: 'What are you doing with my wife?' as though he were very angry. I was on top of the steps; he ran up the steps. When he was running up the steps he hollered: 'Come on, Dick,' had both his hands out and he had something in his hand that shone; it shined bright. In his speed coming up, he knocked me against that door—has a sort of little step there, like stone step—knocked me down on that step. Well, I got up, got away from him; and when I was getting up I pulled my gun out and fired. I went down off the step and went home. I crossed the street and walked right across Lafayette and down to Woodward. When I arrived at my home my trousers were torn. When I got to the house, a policeman was there."

On the cross-examination he testified in part as follows:

"Barrows did not grab hold of me. I knew that Mrs. Barrows heard him coming, because she started down the steps to meet some one. I did not get down off the steps. I did not know it was him coming up. I first knew it was he when he started up the steps. I knew it was he before he started up the steps.

"*Q.* When Barrows was running up the steps, what hindered you when he was coming up the steps there to strike him as he came up towards you; you had the vantage ground, didn't you?

"*Mr. Grose:* I object to that as incompetent and immaterial—the argument of counsel in there, 'You had the vantage ground, didn't you?'

"*Mr. Grose:* Exception for the defendant.

"*A.* Maybe I could have struck him while he was coming up the steps, if I wanted to protect my life. I might have struck him; yes. I don't know as I did intend to

shoot him; I did not intend to kill him. I had no intention of shooting him. I don't know as I thought of anything at the time the shot was fired. I thought enough to draw the revolver out. I drew it out and shot him. I don't know as I intended to shoot him. I did not intend to kill him. I intended to shoot all right. I did not have no intention of shooting him. I didn't intend to shoot any one. The revolver all went off in a minute. I intended to shoot it; I don't know if I intended to shoot Barrows with it. I shot; I shot in self-defense that night. I done it because he had something in his hand. I know he was going to— It all went in a minute; I don't know what my intentions were. I did not intend to kill him. I never had the intention to kill any man. I must have pulled the trigger; it went off. I fired to save my life. I don't remember what I fired at. I knew I pulled the trigger. I don't know as I intended to. I seen something shine in his hand; I could not swear whether it was a revolver or a knife. It was a weapon of some kind." (It is the claim of the people Mr. Barrows had no weapon with him.)

The respondent was cross-examined as to his knowledge of why Barrows had ill feeling toward him, and that is assigned as error. It was the claim of respondent that a letter from Mr. Barrows to his wife had been shown him, which letter contained threats. The court held that if part of the letter was to be admitted it should all be admitted. This is said to be error. The letter is as follows:

" Well, Pauline, I hope you are getting along all right. I am trying to live somewhat respectably. Now, this is what I want to say. The party you knew too well said you had your mind made up to leave three months ago. Now if that is the case, it is no use for me to look for you back; but I would like to see you, and see what arrangements we could make, so that I could help you somewhat if necessary. We can have a nice sociable talk and see what is best for the children; how can we arrange it. I quit my job, I guess I will go painting. Now, well, I don't think it is satisfactory by me paying board for the little ones. He wants to adopt Vivian and I will wait until I hear from you or see you, and then we can see what is best. If you only knew what Billets told Rose what Mike said to him when he met him on the street,

you would go for him and kick, too.   Now I am going to drop speaking about him any more; but if ever I catch him out with you, well, it is good day to him, and I told him so, too.   I don't care who else I see you with; but if I see him, well, that is enough, because he is the dirtiest dog that ever talked about a woman, and you will find it out.   Billets said he would come to court and prove what he said, and bring two more fellows from the house of correction who knew what he used to talk about Sundays and other days when they were all together.   Now you see me as soon as possible and we will arrange for the little ones.

"From ROB."

With this general survey of the case, we think we may consider the several groups of assignments of error. Groups 1 and 2 may be considered together.   In addition to what has already been stated, the court declined to allow the attorney for respondent to show that in the court below the people had caused the attendance of certain witnesses, but did not swear them.   This is said to be error.   In overruling objections to testimony upon the ground that it was immaterial, the court said he thought the testimony was material, and upon another occasion that it was very material, and upon one occasion said to counsel, "Do not be so quick about taking your exception." These are the remarks of the court that are said to be prejudicial.   We have examined with care the rulings of the court and approve of them.   While it perhaps might have been well to have disposed of the objections without remark, it is clear that when testimony was objected to because counsel thought it immaterial the court could not overrule the objection without indicating that it thought it was material.   We cannot see how the oral utterance of that thought could do any harm.   There were other remarks of the court, but we will not refer to them further.

The remarks of the prosecuting attorney which are claimed to be prejudicial occurred when he was seeking to elicit testimony which he said he thought was compe-

tent and material.  This testimony had been objected to and was excluded.  We find no error in this respect.

3. Was there error in the argument of the prosecuting attorneys to the jury?  These arguments are set out in great detail and have been examined with care.  While there is an occasional remark that might well have been omitted, they were fully justified by the record.

4. Complaint is made of the refusal of the court to charge as requested.  Part of these requests were proper and part were not.  So far as they were proper to be given, they were fully covered by the general charge.

5. Was there error in that part of the charge reading as follows:

"You have heard the defendant's statement to you upon the stand.  You should weigh his testimony as you do that of any other witness in the case.  If you believe the defendant's testimony, you may believe it in preference to all other testimony in the case that he had no knowledge of this woman's body, that he never had any carnal intercourse with her; but I charge you in that connection that he is the respondent in the case, and he is charged with the most serious offense known to the laws of this State, and is under inducement to tell that story which will most redound to his credit."

It is said:

"This charge in effect places the question of the credibility of respondent upon one fact alone.  It says in effect you can believe him if you believe he has not been intimate with this woman."

We do not think the charge should be construed as counsel construe it.  It is probable that the reason why the court mentioned one part of respondent's testimony was it was the only part of his testimony in conflict with several other witnesses, and particularly the testimony of Mrs. Barrows.  The jury were told without reserve that they should weigh respondent's testimony, and might believe it if they did believe it.

6. Is there reversible error in what occurred after the

jury had been sent out? It is said there is, because the proceedings were in the absence of the respondent, who was confined without bail. The jury retired at 2:40 p. m. At 6:30 p. m. it was brought in because of word sent by the foreman to the judge, and a colloquy occurred between the judge, the foreman, and the jurors. The respondent was not present, but his counsel was, and gave no intimation to the court until the jury were sent back that his client was not present. It would be a travesty upon justice if a case must be reversed for such a reason. The case took nearly two weeks to try; it was hotly contested. A careful reading of the entire record and briefs satisfies us respondent may count himself fortunate because he was not convicted of a more serious offense than manslaughter.

Judgment is affirmed.

OSTRANDER, C. J., and BIRD, HOOKER, and McALVAY, JJ., concurred.